UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TARA STEELE-HEGG,                          :
                                           :
                          Plaintiff,       :           **OPINION & ORDER**
                                           :           03-CV-5939 (DLI)(MLO)
               -against-                   :
                                           :
COMPUTER ASSOCIATES                        :
INTERNATIONAL, INC.,                       :
                                           :
                          Defendant.       :
                                           :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff, Tara Steele-Hegg, brings this action against defendant, Computer Associates

International, Inc. ("CA"), alleging gender discrimination and retaliation in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff further alleges that

she was not paid the full amount of her sales commissions, and a common law fraud claim.

Defendant now moves for summary judgment under Fed. R. Civ. P. 56. For the reasons set forth

below, defendant's summary judgment motion is denied, except with respect to plaintiff's common

law fraud claim.

**Background**

**I.       Gender Discrimination**

CA, a world-wide computer software company, is headquartered in Islandia, Long Island,

New York. (Steele-Hegg Dep. Ex. I.)[1] Plaintiff is a female citizen and resident of the State of

Arizona. (McEntee Decl. Ex. C at 4.) A CA employee and friend of plaintiff's at the time, Jonathan

---

[1]References to plaintiff's deposition exhibits ("Steele-Hegg Dep. Ex. __") may be found in
Exhibit D of John P. McEntee's Declaration.

Hunter ("Hunter"), notified plaintiff of an available position within the company, and on or about December 21, 1998, Chris Skillings ("Skillings"), a CA employee, hired plaintiff as a Client Service Representative in CA's branch office in Phoenix, Arizona. (*Id*. at 50-65, 75; Steele-Hegg Dep. Ex. V.) Plaintiff earned an annual base salary of $40,000 and discretionary incentive compensation of up to $10,000.00 based upon performance. (Steele-Hegg Dep. Ex. D.) At the time of the initial hire, plaintiff signed an "Employment and Confidentiality Agreement" and received CA's employee handbook, which contains anti-harassment and anti-discrimination policies, and complaint procedures. (McEntee Decl. Ex. C at 148-49, 166-67; Steele-Hegg Dep. Ex. I.)

During her employment at CA, plaintiff reported first to Skillings, then to Richard Smith ("Smith"), and finally, to Hunter. (McEntee Decl. Ex. C at 92-93, 189-90.) Plaintiff was promoted to Relationship Manager approximately nine months after being hired, and then to Sales Executive in April 2000. (*Id*.) At the time of plaintiff's promotion in April 2000, Hunter's team of sales executives consisted of Sheri Bouton ("Bouton"), Lisa Opoka ("Opoka"), Travis McBeth ("McBeth"), and Mark Hammond ("Hammond"). (Steele-Hegg Decl. ¶ 9.) Gillian Shellcross ("Shellcross") was placed on Hunter's team in May 2000. (*Id*.)

CA, and specifically Smith, evaluated plaintiff's performance in writing for the first time on May 1, 2000. (Steele-Hegg Dep. Ex. M.) Although the evaluation stated that plaintiff "entered [the] position with an attitude for success, . . . [had] an ability to focus on and take ownership of issue[s] until they are resolved, . . . [and] work[ed] well with the client base," she was ranked fifth out of the seven employees in her group. (*Id*.) The evaluation also established expectations of plaintiff within the next six months including, but not limited to, establishing at least three key contacts outside of the traditional IT departments for each of her clients, making at least twenty on-site client visits and

seventy phone calls into her sales territory per week, and demonstrating that she understands and can effectively present CA's business strategy to her client base. (*Id*.) Plaintiff signed her May 1, 2000 performance review. (*Id*.)

According to plaintiff's commission statements, she achieved revenue through August 15, 2000 of $161,532 against a year-to-date quota of $666,668, or 24.23%.[2] (Ranni Aff. Ex. 3.) However, as of October 2000, plaintiff had made only one more sale of $4000 to NDC Healthcare ("NDC"), a sales account that had been given to her upon her promotion to Sales Executive, bringing her revenue up to $165,732 against a year-to-date quota of $833,335, or 19.89%. (*Id*; McEntee Decl. Ex. C at 185-88.) Hunter held a team meeting in early October 2000, at which he advised his team that Mark Parrinello ("Parrinello"), Senior Vice President for CA at the time, would be sending out a letter to all employees who had achieved less than twenty percent of quota. (McEntee Decl. Ex. C at 185-86.) Although plaintiff conceded that she fell into the category of having attained less than twenty percent of her year-to-date product quota, she testified that similarly-situated members of Hunter's team did not receive the letter. (*Id*. at 187-88.)

Plaintiff closed two sales toward the end of 2000 credited in the amount of $1,110,586 to NDC. (Ranni Aff. Ex. 3.) Consequently, plaintiff's commission statement dated January 11, 2001 indicated that she had achieved revenue of $1,276,318 against a year-to-date quota of $833,335, or 153.16%. (*Id*.) Plaintiff's performance again was evaluated in writing on January 11, 2001, but this time by Hunter. (Steele-Hegg Dep. Ex. P.) The evaluation indicated that plaintiff received an overall rating of forty-six points, which fell into the category of "meets expectations." (*Id*.) Plaintiff

_____

[2]CA expects its Sales Executives to achieve certain designated sales quotas. (McEntee Dec. Ex. C at 168-69.) CA also requires Sales Executives to maintain a pipeline of prospective clients in sufficient numbers that they will exceed the amount of their quotas. (*Id*. at 179-80.)

scored the lowest possible grade ("below expectations") in several categories, namely (1) understanding CA strategy and vision, (2) effectively manages work to achieve results on time, (3) effectively manages a variety of responsibilities at the same time, (4) makes effective decisions under the pressure of time, and with limited information, (5) communicates clearly and effectively with people at all levels in the organization, (6) remains productive during periods of ambiguity, uncertainty and change, (7) establishes customer confidence and credibility in CA and its technology, (8) effectively supports and utilizes internal systems, processes and methodologies – TAS, sitevisit.com, Sales Forecast System etc., and (9) effectively develops, reviews and adjusts a territory business plan that clearly reflects how to achieve or exceed quota, and allocates time and resources accordingly.  (*Id*.)  However, she scored the highest possible score ("outstanding") in the category of contributes to an enthusiastic, positive work environment; energizing others, and the second highest score ("commendable") in the categories of (1) actively seeks and achieves the cooperation and action from people both within and outside of the department, (2) knows who their customer is, whether within or outside of CA, and (3) employee performs well against assigned quota.  (*Id*.) Plaintiff signed her January 11, 2001 performance review.  (*Id*.)

In or about two months after the January 11, 2001 performance review, plaintiff closed another sale to NDC in the amount of $45,146, bringing her combined sales for fiscal year 2000 ("FY 2000") up to $1,317,264 against a year-to-date quota of $833,335, or 158.07%.  (Ranni Aff. Ex. 3.)[3]  A comparison with plaintiff's female co-workers reveals that plaintiff achieved the highest sales of the group and, with the exception of Bouton who had a lower year-to-date quota, the highest

_____

[3] Given that CA's fiscal year runs from April 1 to March 31, FY 2000 commenced on April 1, 2000 and concluded on March 31, 2001.

total percentage of quota. For instance, Bouton achieved revenue through FY 2000 of $677,416 against a year-to-date quota of $333,334, or 203.22%, Opoka achieved revenue through FY 2000 of $265,644 against a year-to-date quota of $333,334, or 79.69%, and Shellcross achieved revenue through FY 2000 of $250,000 against a year-to-date quota of $333,334, or 75%. (Ranni Aff. Ex. 8.) Out of plaintiff's male co-workers, only McBeth's commission statements were included as exhibits. It appears that McBeth achieved revenue through FY 2000 of $5,936,374 against a year-to-date quota of $833,335, or 712.36%. (Ranni Aff. Ex. 9.) Therefore, plaintiff's achieved the second highest amount of revenue for FY 2000 out of the members of Hunter's team of sales executives.

CA, and specifically Hunter, did not evaluate plaintiff's performance until almost a year later, on or about February 8, 2002. (Steele-Hegg Dep. Ex. T.) On this evaluation, plaintiff received an overall score of twenty-eight out of one hundred points, and in twenty out of the twenty-five performance criteria for which she was evaluated, plaintiff was rated "below expectations." (*Id*.) As a result, CA placed plaintiff on a written performance improvement plan ("PIP"). (Steele-Hegg Dep. Ex. S.) The PIP explains that plaintiff's sales quota achievements of 9.13% of her annual sales quota, of which she achieved 0% of her first quarter ("Q1") monthly quota, 20% of her Q2 monthly quota and 7.4% of her Q3 monthly quota, were unsatisfactory. (*Id*.) The PIP further explains that plaintiff failed to cultivate her pipeline. For instance, as of February 8, 2002, plaintiff's sales forecast of $189,000 and her pipeline of potential sales of $1,184.627 did not approach her objectives of an annual sales quota of $1.4 million and a combined sales forecast and pipeline objective of approximately $4.2 million. (*Id*.) The PIP also explains that plaintiff failed to engage in effective sales activity. Plaintiff averaged only eight client visits per week when she was supposed to be making fifteen, invited Hunter to accompany her on only two sales calls, and failed to invite

sufficient numbers of clients to CA promotional events. (*Id*.) Finally, the PIP states that plaintiff's conduct was unprofessional, that she failed to submit accurate or timely work-related reports, and that she far exceeded her expense budget. (*Id*.) The PIP set forth thirteen specific performance directives to be completed by March 30, 2002, and advised plaintiff that her continued failure to improve her performance could result in additional disciplinary action, up to and including termination of employment. (*Id*.) Plaintiff did not sign her February 2002 performance evaluation. (Steele-Hegg Decl. ¶ 37.)

Hunter testified that he ordinarily would give an employee the opportunity to complete a performance plan before preceding with their termination. (Ranni Aff. Ex. 11 at 355-56.) However, on March 28, 2002, two days before plaintiff's performance directives were to be completed, Hunter supplemented the PIP by comparing plaintiff's performance numbers to the thirteen-point directive set forth in the PIP. (McEntee Decl. Ex. E at 8-9, 20-22, 40-42, 57-60.) The March 28, 2002 document stated, "This note to file documents and supports the termination of Tara Steele. In a written document delivered on 2/8/2002, it was clearly outlined that Tara Steele needed to significantly improve her job performance. The following expectations were not met." (*Id*. at 8.) The document explained how plaintiff failed to meet a single performance objective, as follows:

|   | Objectives | Results |
|---|---|---|
| 1. | To close $350,000 of business by March 30, 2002. | Plaintiff failed to close any business whatsoever. |
| 2. | To increase pipeline by $2.3 million. | Plaintiff increased her pipeline to $1,054,010. |
| 3. | To forecast deals accurately. | Plaintiff forecasted that she would close two sales transactions in the fourth quarter, but she did not close any sales transactions. |

| | | |
|---|---|---|
| 4. | To make ten in-person sales calls with customers. | Plaintiff averaged nine calls per week. |
| 5. | To meet with at least four new contacts per week. | Plaintiff met four new contacts the week of 02/11/02; one new contact the week of 02/18/02; no new contacts the week of 02/25/02; one new contact the week of 03/04/02; three new contacts the week of 03/11/02; and no new contacts the week of 03/18/02. |
| 6. | To take her manager(s) on two in-person sales calls per week, or eight per month. | Plaintiff invited Hunter on only two calls from February 11 to March 28, 2002. |
| 7. | To arrange four VE demonstrations[4] per month. | Plaintiff arranged zero VE demonstrations as of March 28, 2002. |
| 8. | To have five clients, including at least four separate representatives from CA clients *America West Airlines* and *PetSmart*, attend the next CTO/CIO conference or CA Expo. | Plaintiff had one representative from *America West Airlines* attend the February 12 CA Expo; none from *PetSmart*. |
| 9. | To have two clients attend CA web cast presentations each month and two clients on the Autosys[5] web cast on February 26, 2002. | Plaintiff failed to have a single client in attendance for the Autosys web cast on February 26. |
| 10. | To have six clients attend the next CA World promotional event. | Plaintiff failed to have a single client registered for the April 2002 CA World. |
| 11. | To project professionalism in dealings with co-workers, management, and clients. | Plaintiff discussed her PIP with several CA employees, creating a distraction and a negative environment. Moreover, plaintiff left work early at 4:00 p.m. on March 27 to exercise, she did not report to work until 10:30 a.m. on March 28, and she was unaccounted for from 11:00 a.m. to 2:00 p.m. that day. |

[4]A "VE demonstration" is a presentation at a CA office in its Virtual Enterprise Center. This presentation allows customers and potential customers to see CA's software at work.

[5]"Autosys" is a CA software product.

| 12. | To complete reports accurately and submit them in a timely manner. | When asked for her reports on March 28 for the following quarter, plaintiff responded, "Why? I won't be here." |
| --- | --- | --- |
| 13. | Submit expenses to her manager on a weekly basis and reduce business expenses to CA-prescribed limits of $400 for monthly client entertainment, $200 for monthly cellular phone usage, and $315 for monthly mileage. | Plaintiff continued to violate CA's expense policy: in February 2002, she charged $932 for client entertainment, $535 for cellular phone use, and $405 for mileage.<br><br>In March 2002, plaintiff submitted an expense report containing a charge of $768 for client entertainment alone. |

(*Id*. at 8-9.)

The commission statements for the members of Hunter's team collectively reveal that FY 2001 was a difficult year in terms of sales. For instance, plaintiff's FY 2001 commission statements indicate that her sales to existing customers, namely Phelps Dodge and NDC, came out to $69,869 against a year-to-date quota of $988,236, or 7.1%.[6] (Ranni Aff. Ex. 3.) Plaintiff originated one new client during FY 2001, Petsmart, and she achieved sales of $48,261 to Petsmart during FY 2001 against a year-to-date quota for new customers of $164,710, or 29.3%. (*Id*.) Similarly, McBeth only achieved 17% of his annual sales quota to existing customers during FY 2001 (or $169,501 total revenue against a year-to-date quota of $988,236), and did not appear to have originated any new clients. (Ranni Aff. Ex. 9.) Another male co-worker, Patrick Schoenling ("Schoenling"), achieved 33% of his annual sales quota during FY 2001 (or $328,046 total revenue against a year-to-date quota of $988,236). (Ranni Aff. Ex. 9.) Although an examination of both McBeth and Schoenling's

_____

[6]Plaintiff's commission statements indicate that she made one sale to Phelps Dodge in April 2001 for $45,188 and two sales to NDC Healthcare in October 2001, in the amounts of $23,983 and $45,886. (Ranni Aff. Ex. 3.) Moreover, plaintiff's year-to-date quota for FY 2001 was $411,764 through November 2001, but in December 2001, it increased to $988,236. (*Id*.)

February 2002 performance evaluations would be helpful as a basis of comparison, such documentation was not included in the parties' papers. However, it is undisputed that neither McBeth nor Schoenling were placed on a PIP.

By March 2002, the individuals on Hunter's team had changed significantly. Both Shellcross and Bouton were discharged due to a "reduction in force," and Opoka had obtained a transfer. (Bouton Aff. ¶ 2; Steele-Hegg Decl. ¶ 26.) However, two weeks prior to Bouton's termination, CA hired Schoenling to work on the team, and Bouton spent her last two weeks training him. (Bouton Aff. ¶ 3; Steele-Hegg ¶ 26.) Another male, Erik Rakotz ("Rakotz"), was later hired, and McBeth and Hammond remained on the team. Consequently, within one year plaintiff had become the only female team member. (Steele-Hegg Decl. ¶ 26.)

Plaintiff, along with Bouton and Opoka, testified that during their employment at CA the current productive sales accounts were routinely reassigned to their male colleagues. (Bouton Decl. ¶¶ 17-19; Opoka Keller Decl. ¶ 9; Steele-Hegg Decl. ¶¶ 23-25, 29.) Opoka testified that she:

> regularly witnessed the high performing accounts being given to men along with any hot leads that came into the office. Further, whenever a woman was terminated, all of her high performing accounts were given to men. Additionally, good accounts were taken away from women and given to men, and then these women were terminated for poor performance. I witnessed a male replacement (Pat Schoeling) hired right after Sheri Bouton was supposedly laid off for a reduction in force, and (Eric Rakotz) hired right before Tara Steele was terminated. However, these new arrivals were assigned good accounts with forecasted (or soon to be closed) sales and received the commissions.

(Opoka Keller Decl ¶¶ 20-21.) Opoka further testified, "it was clear that the differences in treatment between men and women . . . extended to account assignments, [and] performance evaluation . . . ." (*Id*. at ¶ 9.) Plaintiff testified that one of her strongest accounts, NDC, was reassigned by Hunter to McBeth toward the end of 2001. (Steele-Hegg Decl. ¶ 23.) Plaintiff only became aware of the

transfer when a technology officer at NDC notified her.[7] (*Id*.) Another one of plaintiff's accounts, Phelps Dodge, was reassigned to by Hunter to Rakotz after he was hired in early February 2002. (*Id*. at ¶ 29.) Again, plaintiff only became aware of the transfer when a technical officer from Phelps Dodge notified her. (*Id*.)

Plaintiff further alleges that her superiors at CA, such as Hunter, Parrinello, Andy Richards ("Richards") and Matt Gordon ("Gordon"), treated the women differently from the men by making frequent inappropriate sexual remarks. (Compl. ¶ 8; McEntee Decl. Ex. C at 293-94.) Specifically, plaintiff alleges that Hunter frequently cursed at the women, and consistently exhorted plaintiff to "take one for the team," "do what you need to get the deal done," and "wear a skirt today, low-cut shirt," insinuating that she should engage in sexual relations with her clients to support sales. (Compl. ¶ 15; McEntee Decl. Ex. C at 315-18, 378-81.) Plaintiff further testified that Parrinello "didn't blatantly ask me to sleep with him, but [that he] basically would say, you know, he cheated on his wife all the time, so he asked me how I felt about it . . . that was his way of seeing if I would probably get together with him or if I had any interest in him." (McEntee Decl. Ex. C at 390.) Although plaintiff was offended by such behavior, she testified that it did not affect her ability to

---

[7]Plaintiff submitted a declaration by Patrick Pendleton, Director of Computer Operations at NDC, in opposition to defendant's motion for summary judgment. Unsworn declarations that comply with 28 U.S.C. § 1746 may be treated as equivalent to sworn affidavits for purposes of a summary judgment motion. However, such documents must include a verification by the declarant that its contents are "true under penalty of perjury" and must be dated. Here, the declaration bears the following notation: "Sworn to before me this 30th day of March, 2006" followed by an illegible signature on a line underneath which appears the words "Notary Public." The notation is unaccompanied by a notary stamp or any other indication substantiating that the purported and unidentified notary public is in fact commissioned to notarize signatures, and it contains the same illegible signature, rather than that of Patrick Pendleton. As the declaration fails to comport with the requirements of 28 U.S.C. § 1746, the court will not consider it in deciding defendant's summary judgment motion.

perform her work. (*Id.* at 297-98.) Plaintiff's accounts were corroborated by both Bouton and Opoka. (Bouton Aff. ¶¶ 15-16; Opoka Aff. ¶¶ 11-18.) Jennifer Heinz Ortman ("Heinz Ortman"), a Sales Manager at CA (same position as Hunter), testified that she "witnessed many of the male employees in the office soliciting on Tara and making comments such as 'they wanted to get into her pants.'" (Heinz Ortman Decl. ¶ 16.) Heinz Ortman further testified that:

> If women did not go along with the sexual joking an innuendos, they would be fired or be alienated to a point where they would eventually quit their jobs . . . I witnessed an environment where women were treated as second class to the men. If the women employees were willing to play along with the men, they would receive some benefits. However, the minute a woman stood up to the men, objected to comments or displayed displeasure, and refused to participate in the sexually charged environment, they were alienated and put on a course for termination or forced to resign.

(*Id.* at ¶¶ 31, 33.) Plaintiff testified that she never complained about either Hunter or Parrinello's behavior because "if [she had gone] to HR, it wasn't just stuck with HR. The managers would be notified. We would be – we would be targeted, and they would get rid of us. I've seen it happen before. That's why we never did it. You kept your mouth shut and said 'ha, ha, ha' and played the game." (McEntee Decl. Ex. C at 289.)

## II.    Commission Payments

Plaintiff acknowledged receipt of her FY2000 individual compensation plan, as well as the FY2000 Sales Compensation Plan. (McEntee Decl. Ex. E at 75-104; Steele-Hegg Dep. Ex. K.) Plaintiff also acknowledged receipt of her FY2001 individual compensation plan, which incorporated by reference the FY 2001 Sales Compensation Plan. (McEntee Dec. Ex. E at 150-183; Steele-Hegg Dep. Ex. N.) However, plaintiff disputes having received her FY2002 individual

compensation plan from CA's computer "intranet," which contained a "hyperlink" allowing plaintiff access to the FY 2002 Sales Compensation Plan. (Ranni Aff. Ex. 10 at 209.)

During her tenure as a sales representative at CA, plaintiff received monthly commission statements. (McEntee Decl. Ex. C at 324-25.) The monthly commission statements during the time she was a sales executive in FY2001 identified the Net GAAP Revenue ("NGR")[8], and for FY2002, the Booking Value for each of plaintiff's sales transactions, together with a statement of the commission earned by plaintiff for each such transaction. Plaintiff was paid commissions based upon the Net GAAP Revenue and the Booking Value of her product sales. (*Id*. at 321.) At no time during her employment by CA did plaintiff assert that her sales commissions were miscalculated. (*Id*. at 324.) However, plaintiff states in her Responses to Defendant's Rule 56.1 Statement that she "withdraws her claims for commission beyond those for the NDC sales of $81,476 transferred to McBeth, multiplied by her commission rate of 6.553% totaling at least $5,339.12 in commission wages." (Pl.'s R. 56.1 Stmt. ¶ 44.)

## III.  Retaliation

The incident giving rise to plaintiff's retaliation claim began on March 19, 2002 when plaintiff filed a charge against CA with the United States Equal Employment Opportunity Commission ("EEOC") ("initial EEOC charge"). (McEntee Decl. Ex. F.) On the initial EEOC charge, plaintiff checked the box for sex discrimination only, and alleged that her "Sales Manager ha[d] been systematically eliminating his female sales staff and replacing them with males," and that she had been placed on a "performance improvement plan" on February 8, 2002. (*Id*.)

---

[8]CA uses the acronym "NGV" and "NGR" interchangeably to refer to the Net GAAP Revenue.

Plaintiff testified that she did not tell anyone at CA she intended to file a charge with the EEOC. (McEntee Decl. Ex. C at 311.) However, shortly after doing so, she told Opoka, Hegg, a Recruiter in the Human Resources Department, Shellcross and Bouton that she had filed the initial EEOC charge. (*Id*. at 312-13; Hegg Decl. ¶ 2.) Hegg testified that he advanced plaintiff's complaints to Paul Buonaiuto ("Buonaiuto"), an employee of the Human Resources Department, and Anatoli Kostouros ("Kostouros"), the local Director of Human Resources. (Hegg Decl. ¶¶ 6-10.)

The EEOC Case Log indicated that the initial EEOC charge was "mailed out" on March 28, 2002. (McEntee Decl. Ex. H.) From March 28 to April 1, 2002, Kostouros, Beth McMurtry ("McMurtry"), a Manager in the Human Resources Department, Dorothe Pace ("Pace"), the Regional Manager of Human Resources, and Kevin Long ("Long"), Divisional Senior Vice President of Human Resources, conferred regarding Hunter's recommendation to discharge plaintiff because of her alleged lack of productivity and poor performance, despite counseling. (McEntee Decl. Ex. E at 60-61.) On April 1, 2002, CA terminated plaintiff's employment. Thereafter, plaintiff filed an amended charge with the EEOC on June 6, 2002 to add a claim of retaliation ("amended EEOC charge"). (Steele-Hegg Dep. Ex. U.) Plaintiff concedes that CA made the decision to discharge her prior to March 28, 2002. (Steele-Hegg Dep. Ex. V at 50-51.) Moreover, plaintiff did not allege sexual harassment in either her initial EEOC charge or her amended EEOC charge. (McEntee Decl. Ex. C at 275.) On August 21, 2003, the EEOC issued a Dismissal and Notice of Rights to Sue. (McEntee Decl. Ex. G.) Plaintiff commenced the instant action on November 21, 2003. United States District Judge Denis R. Hurley dismissed the second and third claims in plaintiff's complaint, with prejudice, by stipulation and order of partial dismissal dated March 25, 2004.

**Discussion**

## I. Summary Judgment Standard

Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.

The Second Circuit has recognized that courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is frequently at issue. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1998). However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The function of the court "is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Cronin v. Aetna Life Insurance Co.,* 46 F.3d 196, 204 (2d Cir. 1995) (*quoting Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir. 1994)).

## II.    Title VII Claims

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff asserts two bases for relief under Title VII – gender-based discrimination and retaliatory discrimination.[9]

### A.    Gender Discrimination

Under Title VII, discrimination claims must be analyzed under the three-part burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Under the *McDonell Douglas* framework, the plaintiff carries the initial burden of proving a prima facie case of discrimination.  *Id*.  The defendant may then rebut by articulating a legitimate, nondiscriminatory reason for its adverse employment action.

---

[9]Plaintiff appeared to raise a claim for sexual harassment in the complaint.  (*See* Compl. ¶ 8.)  However, plaintiff has since withdrawn the claim given that her opposition brief states, "plaintiff does not assert a claim for sexual harassment.  Rather, the references to inappropriate sexual remarks and attitudes are offered as evidence of a gender bias and discriminatory motivation."  (Pl.'s Mem. Opp'n Summ. J. 4.)  In any event, plaintiff has failed to exhaust her administrative remedies with respect to her sexual harassment claim.  *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 82-83 (2d Cir. 2001) ("Exhaustion of remedies is a precondition to suit.").  A federal court may generally only hear claims that were either brought in the EEOC charge or are "reasonably related" to claims that were presented in the EEOC charge.  *See Butts v. City of New York Dep't. of Hous. Preservation and Dev.,* 990 F.2d 1397, 1401 (2d Cir. 1993), superseded by statute on other grounds as stated in *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir. 1998).  Here, plaintiff referenced only gender discrimination in the initial EEOC Charge, and retaliation in the Amended EEOC charge.  (McEntee Decl. Ex. F.)  Moreover, as a sexual harassment claim is not "reasonably related" to the allegations contained in plaintiff's EEOC charges, the court is prevented from hearing such a claim.  *See Holtz,* 258 F.3d at 83 ("[A] claim raised for the first time in the district court is 'reasonably related' to allegations in an EEOC charge 'where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'").

-15-

However, the defendant's burden at this stage is merely one of production, not persuasion.  *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d. 407 (1993).  Once the defendant meets this burden, "the presumption of [discrimination] 'drops out of the picture.'"*Id.* at 509.  The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that the employment decision was motivated by unlawful discrimination.  *See Stern v. Trustees of Columbia Univ. in the City of New York,* 131 F.3d 305, 312 (2d Cir. 1997).

　　　1.　　Prima Facie Case

　　　In order to survive a motion for summary judgment, the employee's burden of proof at the prima facie stage is *de minimus.  See Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001).  However, the employee must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive.  *See Cronin.,* 46 F.3d at 204. To establish a prima facie case of gender discrimination, a plaintiff must show that she:  (1) is a member of a protected class; (2) performed her job satisfactorily; (3) suffered an adverse employment action; and (4) that the circumstances under which the negative employment action took place give rise to an inference of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802. A plaintiff may raise such an inference by showing that the employer subjected her to disparate treatment, that is, treated her less favorably than a similarly-situated employee outside her protected group.  *See Graham v. Long Island Rail Road,* 230 F.3d 34, 39 (2d Cir. 2000).

　　　In the instant case, plaintiff claims that CA discriminated against her based on her gender by reassigning her lucrative accounts to her male colleagues, placing her on a PIP, and ultimately discharging her.  Defendant challenges the sufficiency of plaintiff's evidence on the second, third

and fourth elements of her prima facie case.  Defendant also asserts that it has offered a legitimate nondiscriminatory reason for its actions.

It is clear that plaintiff has made out a prima facie case.  First, plaintiff is a member of a protected class because she is a woman.  Additionally, a genuine issue of material fact exists with respect to whether plaintiff performed her job satisfactorily given that she achieved revenue of $1,317,264 for FY 2000 against a year-to-date quota of $833,335, or 158.07%, making her the second highest revenue-generator on Hunter's team of sales executives that year.  (Ranni Aff. Ex. 3, 8, 9.)  Although plaintiff only achieved 7.1% revenue against her year-to-date quota for new product sales to existing customers, and 29.3% revenue against her year-to-date quota for new product sales to new customers for FY 2001, the commission statements reveal that FY 2001 was a difficult year for all members of Hunter's team in terms of sales regardless of gender.  (Ranni Aff. Ex. 3; Ex. 8; Ex. 9.)  Notably, McBeth only achieved 17% of his annual sales quota and Schoenling only achieved 33% of his annual sales quota for FY 2001.  (Rann Aff. Ex. 9.)  Moreover, plaintiff successfully originated one new client during FY 2001 - Petsmart - whereas neither McBeth nor Schoenling originated any new clients.  Finally, plaintiff's performance evaluation dated January 11, 2001 indicated that plaintiff performed her job satisfactorily because she received an overall rating of 46 points, falling into the category of "meets expectations." (Steele-Hegg Dep. Ex. P.)  Given that plaintiff's performance numbers did not differ significantly from those of her male colleagues', plaintiff's negative February 2002 evaluation, which gave her an overall score of twenty-eight out of one hundred points, seems rather surprising.

With respect to the third element, plaintiff asserts that defendant engaged in three actions that constituted adverse employment actions – reassignment of productive sales accounts,

placement on a PIP, and termination of employment. An "adverse employment action" is generally

defined as a "materially adverse change" in the terms and conditions of employment. *Sanders v.*

*New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). "To be materially adverse,

a change in working conditions must be 'more disruptive than a mere inconvenience or an

alteration of job responsibilities.'" *Id*. (*quoting Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.

2003)). While the case law within the Second Circuit is well-settled that termination of

employment constitutes an adverse employment action and placement on a PIP does not, s*ee*

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000); *Brown v. American Golf*

*Corp.,* 99 Fed. Appx. 341, 343 (2d Cir. 2002) (citing *Wanamaker v. Columbian Rope Co.,* 108

F.3d 462, 465 (2d Cir. 1997) ("being placed on the Performance Improvement Plan was not an

adverse employment action"), it is less clear whether the reassignment of plaintiff's lucrative sales

accounts to her male colleagues constitutes an adverse employment action.

Account transfers that do not result in a demotion through loss of pay, rank, title or

significant job responsibilities do not ordinarily constitute adverse employment actions. *See*

*Galabya,* 202 F.3d at 641. However, an involuntary transfer may constitute an adverse

employment action if the plaintiff shows that the transfer created a materially significant

disadvantage with respect to the terms of her employment. *See Williams v. R. H. Donnelly Corp.,*

368 F.3d 123, 128 (2d Cir. 2004). Therefore, the "key inquiry . . . is whether the transfer

constitutes a negative employment action tantamount to a demotion." *Patrolmen's Benevolent*

*Ass'n v. City of New York,* 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999). Here, there is no dispute that

plaintiff retained her salary, rank and title even though two of her accounts, NDC and Phelps

Dodge, were reassigned to McBeth and Rakotz, respectively. However, plaintiff contends that she

lost certain commission payments because of the reassignments. Thus, viewing the facts in a light most favorable to plaintiff, the court concludes that the reassignment of the NDC and Phelps Dodge accounts constitutes an adverse employment action.

Finally, plaintiff has produced evidence that the termination of her employment and the reassignment of the NDC and Phelps Dodge accounts to her male co-workers did occur under circumstances giving rise to an inference of discrimination. First, plaintiff asserts that she was subjected to harassing and discriminatory conduct on account of her sex. For instance, plaintiff testified that Hunter frequently told her to "take one for the team," "do what you need to get the deal done," and "wear a skirt today, a low-cut shirt." (Compl. ¶ 15; McEntee Decl. Ex. C at 315-18, 378-81.) Moreover, Bouton, Opoka and Heinz Ortmam all corroborated plaintiff's testimony that Hunter would frequently make comments to plaintiff insinuating that she should engage in sexual relations with her clients to support sales. (Bouton Aff. ¶¶ 15-16; Opoka Aff. ¶¶ 11-18; Heinz Ortman ¶ 16.) In addition, the evidence indicates that the female members of Hunter's team were systematically eliminated throughout FY 2001 because, at the beginning of year, the team consisted of three females and two males, while by the end, plaintiff was the only female member. (Steele-Hegg Decl. ¶ 26.) Moreover, although both Shellcross and Bouton were discharged due to a "reduction in force," Hunter hired a male, Schoenling, two weeks prior to Bouton's termination. (Bouton Aff. ¶¶ 2-3; Steele-Hegg Decl. ¶ 26.) Finally, the court notes that neither McBeth nor Schoenling were placed on a PIP after their February 2002 evaluations, even though their performance numbers did not differ markedly from plaintiff's. (*See* Ranni Aff. Ex. 3; Ex. 9.)

Defendant contends that an inference of discrimination is not appropriate here because (1) plaintiff never complained to anyone, (2) the incidents were isolated, (3) the comments were made

largely by nondecision-makers, and (4) Hunter made both the decision to hire and fire plaintiff. First, plaintiff testified that she could not complain at the time because she "would [have been] targeted," and subsequently discharged. (McEntee Decl. Ex. C at 289.) Second, the record indicates that comments were made primarily by decision-makers given that Hunter was a Sales Manager and plaintiff's direct boss, and Parrinello was the Senior Vice President for CA at the time. Third, while Hunter instigated the process resulting in the termination of plaintiff's employment, he did not hire her; rather, he merely notified plaintiff that a Client Service Representative position was open. Finally, it appears from the record that the inappropriate sexual remarks were not isolated instances, but rather indicative of the pervasive discriminatory culture at CA. Given that plaintiff's burden of proof is *de minimus*, the court finds that plaintiff has satisfied each element of her prima facie case.

### 2. Legitimate Nondiscriminatory Reason and Evidence of Pretext

Defendant next asserts plaintiff's poor performance as a legitimate nondiscriminatory reason for its actions. Because defendant articulated a legitimate reason, plaintiff is required to produce sufficient evidence for a jury to find both that defendant's reason is pretextual, and that its true reason was discriminatory. Construing the facts in a light most favorable to plaintiff, the evidence in this case permits a rational factfinder to infer that defendant's proffered reason – deficient work performance – was pretextual, and that the true reason was discriminatory. As to the question of pretext, plaintiff has offered proof that her performance was not deficient. She has submitted both her own commission statements, as well as those of her colleagues, to demonstrate that she achieved the second highest amount of revenue for FY 2000 on the team, and that her performance for FY 2001 was average at worst. Moreover, during FY 2001, plaintiff successfully

originated one new client, something neither McBeth nor Hammond were able to do. Such evidence is unquestionably sufficient to demonstrate pretext. Finally, the fact that Hunter supplemented plaintiff's PIP "to file documents and support the termination of Tara Steele," by comparing her performance numbers to the thirteen-point directive set forth in her February 2002 PIP, *before* the time period to complete the directives had expired, creates a genuine issue of material fact as to whether defendant's true motive was discriminatory.

### B.     Retaliation

Defendant also seeks summary judgment on plaintiff's retaliation claim arguing that, as a matter of law, plaintiff cannot establish a causal connection between her participation in activity protected by Title VII and defendant's conduct. Title VII prohibits employers from discriminating against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter . . . ." 42 U.S.C. § 2000e -3(a). A prima facie case of retaliation under Title VII requires the plaintiff to show:  (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See Hunter v. St. Francis Hosp.,* 281 F. Supp. 2d 534, 546 (E.D.N.Y. 2003) (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir. 1998)).  Once this showing is made, the defendant "must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for true discriminatory motive." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir. 1996).

1.      Prima Facie Case

In the present action, the record reveals, and the parties do not dispute, that plaintiff engaged in activities protected under Title VII, and that CA became aware of plaintiff's initial EEOC charge.  Nor is there any dispute that termination of employment constitutes an adverse employment action.  *See Galabya,* 202 F.3d at 640.  However, defendant contends that plaintiff has failed to tender sufficient evidence to allow a factfinder to reasonably conclude that plaintiff has asserted the third element of her prima facie case.

A causal connection between the adverse action and the protected activity can be established indirectly by showing that the retaliatory action occurred close in time to the protected activity.  *See Hunter,* 281 F. Supp. 2d at 547.  Viewing the evidence in a light most favorable to the plaintiff, a factfinder could reasonably conclude that a causal connection exists between defendant's action and plaintiff's participation in a protected activity.  Plaintiff filed her initial EEOC charge on March 19, 2002, and less than two weeks later, on April 1, 2002, plaintiff was discharged.  (McEntee Decl. Ex. E.)  The proximity between plaintiff's initial EEOC charge and her discharge, in itself, presents sufficient circumstantial evidence of causation.  *See e.g., Johnson v. Palma*, 931 F.2d 203, 208 (2d Cir. 1991) (showing that the adverse action directly following the filing of the administrative charge is sufficient to establish the requisite causal connection); *Francoeur v. Corroon & Black Co.,* 552 F. Supp. 403, 410 (S.D.N.Y. 1982) (approximately one-month period between participation in protected activity and retaliatory act in itself establishes prima facie case).

Notwithstanding this evidence, defendant argues that plaintiff cannot establish causation because the allegedly retaliatory conduct occurred before CA received plaintiff's initial EEOC

charge. Defendant directs the court's attention to the EEOC Case Log which states that the charge was "mailed out" on March 28, 2002, and the series of emails indicating that Kostouros, McMurtry, Pace, and Long began conferring about Hunter's recommendation to discharge plaintiff on or about March 28, 2002 – before they would have received her charge. (McEntee Decl. Ex. H; Ex. E at 60-61.) Moreover, defendant contends that it would have been impossible for anyone at CA to have known that plaintiff had filed the initial EEOC charge because plaintiff testified that she did not disclose her intentions to anyone at CA before filing the charge. (McEntee Decl. Ex. C at 311.)

However, the evidence contained in the record could lead a reasonable factfinder to infer otherwise. For instance, plaintiff testified that she told two CA employees, Opoka and Hegg, and two former CA employees, Shellcross and Bouton, that she had filed the charge shortly after doing so. (*Id*. at 312-13; Hegg Decl. ¶ 2.) Moreover, Hegg testified that he told Kostouros and Buonaiuto about plaintiff's complaint. (Hegg Decl. ¶¶ 6-10.) Notably, Kostouros was the local Director of Human Resources at the time and was involved in the discussions about whether to discharge plaintiff. Therefore, a factfinder could reasonably infer that CA employees were aware that plaintiff had filed the initial EEOC charge prior to receiving it from the EEOC. Similarly, defendant's reliance on plaintiff's concession that CA made the decision to discharge her before receiving the initial charge is unavailing given Opoka and Hegg's testimony that they were both aware plaintiff had filed a charge and that Hegg advanced the information to Kostouros and Buonaiuto.

Accordingly, plaintiff has made out a prima facie case of retaliation.

2. Legitimate Nondiscriminatory Reason and Evidence of Pretext

Defendant has met its burden to articulate a legitimate nondiscriminatory reason for plaintiff's discharge by again asserting plaintiff's deficient work performance. As such, the burden shifts to plaintiff to demonstrate that CA's proffered reason was not the true reason for the employment decision. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed 2d 105 (2000). But proof that CA's proffered justification is false, however persuasive, "is simply one form of circumstantial evidence that is probative of intentional discrimination." *Id*. at 147 (citing *St. Mary's Honor Center*, 509 U.S. at 517). Plaintiff may instead rely on evidence – circumstantial or otherwise – showing that "an impermissible reason was 'a motivating factor,' without proving that the employer's proffered explanation" played no role in its conduct. *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 120 (2d Cir. 1997). In some cases, such as this one, "plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raises a question of fact to be resolved by the factfinder after a trial." *Carlton v. Mystic Transp. Inc.,* 202 F.3d 129, 135 (2d Cir. 2000).

Accordingly, plaintiff's failure to show that CA's stated reason for her discharge was false is not fatal. A rational jury could conclude from the circumstances of her termination – the fact that it occurred two weeks after plaintiff had filed the initial EEOC charge, and the evidence that the persons who made the decision to terminate plaintiff may have known of the charge – that retaliation for protected activity "was *a* substantial motivating factor" for the adverse employment action. *Fields*, 115 F.3d at 121 (emphasis in original). Of course, a jury could also discredit the evidence of improper motive, or could conclude that CA would have terminated plaintiff

irrespective of its desire to retaliate for her protected activity. However, those are questions "to be resolved by the factfinder after trial." *Cronin,* 46 F.3d at 203.

## III.  Plaintiff's State Law Claims

Defendant moves for summary judgment on plaintiff's remaining contract and fraud claims on the ground that, should the court grant defendant summary judgment as to plaintiff's federal causes of action, it should decline to retain jurisdiction over the state law causes of action.

### 1.  Contract Claim

The court first notes that plaintiff has withdrawn her claim for unpaid commissions, except for $5,339.12 in commissions that she is allegedly owed from sales made to NDC after it was reassigned to McBeth. (Pl.'s 56.1 Stmt. ¶ 44.) Section 1367(a) gives the court "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). State and federal claims form "one case or controversy" when they "derive from a common nucleus of operative facts or when both claims would normally be expected to be tried in a single judicial proceeding." *United Mine Workers of America v. Gibbs.,* 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). Here, plaintiff's contract claim arises out of the identical set of factual allegations that form the basis of her federal causes of action. Therefore, in the interests of judicial economy, the court will retain jurisdiction over plaintiff's claim for $5,339.12 in unpaid commissions. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988).

2.    <u>Fraud Claim</u>

With respect to the common law fraud claim, plaintiff maintains that defendant promised to "pay all compensation" and to "engage in good faith performance of their obligations under the contract." (Compl. ¶ 48.) Plaintiff allegedly relied on such representations even though defendant "never intended to make and failed to make payments thereunder." (*Id*. at ¶¶ 49-51.) In order to prove fraud under New York law, a plaintiff must show that (1) the defendant made material false statements, (2) the defendant intended to defraud the plaintiff, (3) plaintiff reasonably relied upon the statements, and (4) plaintiff suffered damage as a result of such reliance. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir. 1996) (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir. 1995)). In this case, plaintiff has failed to make the requisite showing. Plaintiff's claim for fraud rests entirely on conclusory allegations. She has not asserted any facts, and her opposition papers do not address the fraud arguments at all. As such, plaintiff's conclusory argument is insufficient to state either a claim for common law fraud or to preclude granting summary judgment in defendant's favor. *See Scotto v. Almanas,* 143 F.3d 105, 114 (2d Cir. 1998) (stating that the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation" to overcome summary judgment). Accordingly, defendant's motion for summary judgment with respect to plaintiff's common law fraud claim is granted

**Conclusion**

For the reasons set forth above, defendant's motion for summary judgment is denied, except with respect to plaintiff's common law fraud claim.

SO ORDERED.

DATED:      Brooklyn, New York
            July 9, 2007


_____/s/_____
DORA L. IRIZARRY
United States District Judge